UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

AMERISOURCEBERGEN DRUG )
CORPORATION, )
 )
      Plaintiff )   CIVIL ACTION
 )   DOCKET NO. 05-10131 PBS
v. )
 )
BEDARD PHARMACY, INC. )
 )
      Defendant )

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANT'S MOTION TO DISMISS,
OR IN THE ALTERNATIVE,
TO TRANSFER**

Defendant Bedard Pharmacy, Inc., a Maine corporation, submits this memorandum in support of its Motion to Dismiss for lack of personal jurisdiction and/or improper venue. Alternatively, Defendant moves that this Court transfer venue of this action to the United States District Court for the District of Maine, pursuant to 28 U.S.C. §§ 1404, 1406, or 1631.

**I.     RELEVANT FACTUAL BACKGROUND.**

The Plaintiff, AmerisourceBergen Drug Corporation is a seller of wholesale pharmaceutical products. Amended Complaint, ¶ 5. It is a Delaware corporation. Id. ¶ 1. Its principal place of business is in the Commonwealth of Pennsylvania. Id. ¶ 1. AmerisourceBergen has brought this action for alleged breach of a purchase and sale contract (attached to the Amended Complaint as Exhibit A) against a small pharmacy

business located in Lewiston, Maine, and which only does business within the State of Maine. Amended Complaint, ¶ 2; Declaration of Michael Nadeau, ¶¶ 2, 3, 4.

Indeed, AmerisourceBergen Drug Corporation ("AmerisourceBergen") expressly alleges that the Defendant Bedard Pharmacy, Inc. ("Bedard Pharmacy") is a Maine corporation with its principal place of business located at 61 College Street, Lewiston, Maine 04240. Amended Complaint, ¶ 2. AmerisourceBergen dispatched an agent to the State of Maine to solicit the business of Bedard Pharmacy in Lewiston. Nadeau Declaration, ¶¶ 5, 6. That contact took place at the Lewiston office, and resulted in the negotiation of the purchase and sale contract in issue. That contract was signed and executed in the State of Maine. Nadeau Declaration, ¶¶ 5, 6.

The contract expressly provides under the "Title And Risk Of Loss" section of the parties' agreement that "All goods are F.O.B. Customer's location, with freight prepaid. Title and risk of loss passes upon delivery to Customer." Exhibit A, to Complaint and hereto, Prime Vendor Agreement, ¶ 2.7. In other words, performance of the contract (i.e., AmerisourceBergen's delivery of goods) also occurs in Maine – at the "Customer's location." Id.

Bedard Pharmacy has no employees in Massachusetts. Nadeau Declaration, ¶ 3. Bedard Pharmacy has no office locations or any other business locations in Massachusetts. Id., ¶¶ 2, 4. It does not transact or solicit business from Massachusetts customers. Id. It is simply a local pharmacy, located in Lewiston, Maine.

For the reasons set forth below, personal jurisdiction is lacking, and AmerisourceBergen has commenced this action in the wrong venue. The action should

520053

2

be dismissed without prejudice for these reasons, for transferred to the United States District Court for the District of Maine pursuant to the federal transfer statutes, 28 U.S.C. §§ 1404, 1406 and/or 1631.

## II.   LEGAL ANALYSIS.

### A.   Lack of Personal Jurisdiction.

Bedard Pharmacy challenges personal jurisdiction on prima facie grounds. See Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 674-77 (1st Cir. 1992). A federal court exercising diversity jurisdiction "is the functional equivalent of a state court sitting in the forum state." Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995) (quoting Ticketmaster – New York, Inc. v. Alioto, 26 F.3d 201, 204 (1st Cir. 1994)). "The court must, therefore, find sufficient contacts between the defendant and the forum to satisfy both that state's long-arm statute and the Fourteenth Amendment's Due Process clause." Id. "[P]laintiff bears the burden of proving that jurisdiction lies in the forum state." Id.

AmerisourceBergen's Amended Complaint sets forth no allegations providing a basis for personal jurisdiction over Bedard Pharmacy. There are no allegations that Massachusetts' long-arm statute provides a basis for personal jurisdiction. Nor could there be any such allegations, because Bedard Pharmacy is a Maine corporation where the purchase and sale contract in issue was solicited, negotiated, and performed entirely within the State of Maine. Nadeau Declaration, ¶¶ 5, 6. AmerisourceBergen could have shipped its pharmaceutical products from anywhere in the world; that fact, alone, cannot establish personal jurisdiction over Bedard Pharmacy at any location of an AmerisourceBergen shipment. Indeed, the very contract between the parties that

520053

AmerisourceBergen places in issue, attached as Exhibit A hereto, specifies that "delivery" is complete at the "customer's location" and that title and risk of loss of the shipped goods passes only at the point of delivery, at the Bedard Pharmacy in Lewiston, Maine. In other words, the key aspects of performance of this contract all take place in Maine – the alleged "receipt of invoices for Goods" and the alleged "acceptance" of goods under paragraph 10 of the Amended Complaint takes place at the point of "delivery" of the goods in Lewiston, Maine.

There are no other contacts to the Commonwealth of Massachusetts. Bedard Pharmacy does not transact business in the Commonwealth of Massachusetts, nor is it licensed to do so. Its offices and pharmacy locations are in Maine. Indeed, AmerisourceBergen itself is not even a Massachusetts corporation – it is a Delaware corporation with a principal of business in the Commonwealth of Pennsylvania. It is important to note however that AmerisourceBergen is *registered to do business in the State of Maine as a foreign corporation*.

In addition to the failure to bring this case within the reach of the Massachusetts long-arm statute, AmerisourceBergen would also fail to establish that an exercise of jurisdiction in this instance would not violate federal constitutional standards. Barrett v. Lombardi, 239 F.3d 23, 26 (1st Cir. 2001). To make this demonstration, AmerisourceBergen must put forth competent evidence of specific facts which, if credited, would support a finding of personal jurisdiction. Id. These constitutional due process requirements are not met in this case.

520053

In order to meet the due process standards, a plaintiff seeking to impose "specific jurisdiction" over a nonresident defendant must "first demonstrate that its cause of action 'arises out of, or relates to' defendant's contacts with the forum state." Helicopteros Nationales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984); Sawtelle v. Farrell, 70 F.3d 1381, 1389 (1st Cir. 1995) (emphasis added). Then, a plaintiff must demonstrate the "deliberateness" of the defendant's contacts, or that the defendant "purposefully avail[ed] [him]self of the privilege of conducting activities within the forum state." Hanson v. Denckla, 357 U.S. 235, 253 (1958); Sawtelle, 70 F.3d at 1391. Only if the plaintiff succeeds in making these two showings, does the inquiry continue to the five so-called "gestalt" factors to determine the "reasonableness of jurisdiction on the grounds that an exercise of jurisdiction would be otherwise inconsistent with 'fair play and substantial justice'." Id.; see Sawtelle, 70 F.3d at 1391-95. Bedard Pharmacy challenges each of these elements in this case and contends that AmerisourceBergen is unable to establish personal jurisdiction under these standards.

This contract was solicited by AmerisourceBergen's conduct in sending agents to the State of Maine, who by their physical presence in the State of Maine solicited the contract in issue. The contract was negotiated and executed in the State of Maine, and its substantial performance – delivery, acceptance of goods, payment remittance – all takes place in Maine. A purchaser who does not step foot in Massachusetts, but merely receives goods from a seller (who is itself a Delaware corporation with a principal place of business in the Commonwealth of Pennsylvania), cannot without more be subject personal jurisdiction in Massachusetts.

520053

5

Furthermore, there is no evidence that Bedard Pharmacy has purposefully availed itself of the privilege of conducting activities within the Commonwealth of Massachusetts, or that it reasonably could have anticipated being haled in to court here. AmerisourceBergen sent its agents into the State of Maine to solicit this contract. Due process demands that a corporation have sufficient contacts with Massachusetts "to make it reasonable . . . to require the corporation to defend the particular suit which is brought [here]." International Shoe Co. v. Washington, 326 U.S. 310, 317 (1945). AmerisourceBergen fails to make a prima facie showing of jurisdiction on each of the due process elements in the present case.

**B.    Transfer to Cure Want of Jurisdiction.**

Lack of personal jurisdiction should result in a dismissal without prejudice. In the alternative, Bedard Pharmacy moves to transfer this action pursuant to 28 U.S.C. § 1631, to cure the want of jurisdiction. That statute provides:

> Whenever a civil action is filed in a [federal district] court . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed and/or noticed for the court from which it is transferred.

28 U.S.C. § 1631. The statute does not apply to require transfer to another district court, but transfer is within the court's discretion. Britell v. United States, 318 F.3d 70, 74 (1st Cir. 2003) (citing Liriano v. United States, 95 F.3d 119, 122-23 (2d. Cir. 1996) (transfer is not automatic, and "[i]n conducting its inquiry into the presence or absence of such factors, a putative transferor court must consider the totality of the circumstances.").

520053

6

Here, the circumstances set forth below that would also favor a change in venue to the United States District Court for the District of Maine, would also favor transfer under Section 1631 if this Court finds a want of jurisdiction. Certainly, an additional circumstance to consider is that neither party in this case is a resident of the Commonwealth of Massachusetts with a principal place of business here, and AmerisourceBergen is a nonresident plaintiff who could prosecute this case with equal efficiency in a forum in the State of Maine, a state in which it has already registered to do business.

C. **Improper Venue.**

AmerisourceBergen alleges venue under 28 U.S.C. § 1391(a)(2). But that provision does not support venue in Massachusetts:

> A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a). Clearly, subsection (1) does not apply because the only Defendant – Bedard Pharmacy – is a resident of Maine. Subsection (2) does not apply because the events or omissions "giving rise to the claim" occurred in Maine – delivery of invoices and goods, acceptance of goods, and disputes over pricing or amounts owed. All of these "performances" allegedly due under this contract are events or omissions that take place either expressly or by implication in Maine, as the result of a contract solicited,

520053

7

negotiated, and executed in Maine. AmerisourceBergen sent an agent to Maine, who solicited this contract by his physical presence within Maine. Again, all of the elements that defeat personal jurisdiction in this matter also defeat venue under Section 1391(a).

When venue is challenged on a motion to dismiss, the plaintiff has the burden to present sufficient facts showing venue is appropriate. Cordis Corp. v. Cardiac Pacemakers, 599 F.2d 1085, 1086 (1st Cir. 1979). All that AmerisourceBergen can point to in support of venue in Massachusetts is that Massachusetts is where some of its own agents work, and where AmerisourceBergen has unilaterally chosen to locate one of its shipment facilities. The contracts it solicits, negotiates, and signs however – such as the contract in issue in this case – provide that delivery and acceptance of goods do not take place at the point of shipment, but at the "customer's location." See, Exhibit A, Prime Vendor Agreement, ¶ 2.7. At most, to the extent the facility of AmerisourceBergen is relevant at all to the venue question, it points to an *insubstantial* part of the events or omissions involving the claim, and not the "substantial part" intended under § 1391(a)(2). Certainly, one cannot say that a "substantial part of the property that is the subject of the action" is situated in Massachusetts, because pharmaceutical products AmerisourceBergen alleges it has already shipped to Bedard Pharmacy were delivered and accepted, if at all, in Maine and not in Massachusetts.

Venue is therefore improper, warranting dismissal of this action for improper venue pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1391(a).

    D.    **Transfer to Cure and Change Venue.**

520053

Federal statutes also provide for transfer to cure improper venue:

> The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

28 U.S.C. § 1406(a). In addition, change of venue "[f]or the convenience of parties and witnesses, in the interest of justice," also permits transfer of any civil action to any other district where it might have been brought. 28 U.S.C. § 1404(a). Venue would properly lay in the United States District Court for the District of Maine, under either §1391(a)(1) (the district where Bedard Pharmacy resides) or § 1391(a)(2) (where a substantial part of the events or omissions giving rise to the claim occurred). Bedard Pharmacy is also subject to personal jurisdiction in Maine. 28 U.S.C. § 1391(a)(3). Therefore, in the alternative, if this action is not dismissed it should be transferred to the United States District Court for the District of Maine.

If resolution of the issue is left to questions of the convenience of parties or witnesses, within the "interest of justice," these interests also support transfer to Maine. Bedard Pharmacy is a relatively small business, and its principals do carry in connection with their business on-call emergency pharmaceutical responsibilities that foreseeably make attendance at a trial beyond Portland, Maine difficult or a substantial hardship. Nadeau Declaration, ¶7. In contrast, AmerisourceBergen is already prepared to litigate this case beyond its resident states of Delaware or Pennsylvania, and suffers no hardship at all in relation to the forum. The interests of justice under these circumstances strongly support a change of venue to the United States District Court for the District of Maine.

520053

## CONCLUSION

For the foregoing reasons, Bedard Pharmacy respectfully requests that this Court dismiss this action without prejudice for lack of jurisdiction or improper venue, or in the alternative, order transfer of this action to the United States District Court for the District of Maine.

Dated: March 4, 2005

                          HINCKLEY ALLEN SNYDER, LLP

                          By: \s\ Charles E. Schaub, Jr.
                                Charles E. Schaub, Jr.
                                BBO #444920
                                Hugh J. Gorman, III, Esq.
                                BBO #552147
                                Attorney for Defendant
                                28 State Street
                                Boston, MA 02109-1775
                                617-345-9000

                                Russell B. Pierce, Jr., Esq.
                                Adrian P. Kendall, Esq.
                                NORMAN, HANSON & DETROY, LLC
                                415 Congress Street
                                P.O. Box 4600
                                Portland, ME 04112
                                207-774-7000

                                Of Counsel

520053

# PRIME VENDOR AGREEMENT

This Prime Vendor Agreement ("Agreement") is made as of 9/4/02 ("Effective Date") by AmeriSource Corporation and Bergen Brunswig Drug Company, together and separately doing business as AmerisourceBergen ("Distributor") and Bedard Pharmacy Inc, a Maine corporation, Bedard Medical, Inc., a Maine Corporation, and Bedard Long Term Care, a Maine Corporation, all of which agree to be jointly and severally bound hereby, and are jointly and severally referred to herein as "Customer".

A. Distributor is a national distributor of pharmaceutical and other products and services, including prescription (Rx) and over-the-counter (OTC) pharmaceuticals, nutritional, health and beauty care (HBC) and home health care (DME) products (collectively, "Products");

B. Customer owns and operates one or more retail pharmacies ("Facilities"); and

C. The parties intend by this Agreement to set forth their obligations to each other for an arrangement under which Distributor will provide Products and services to Customer ("Program").

NOW THEREFORE, the parties agree as follows:

1. PRICING AND PAYMENT TERMS

Distributor will be the Primary Vendor of all requirements of Customer's Facilities for Products. Customer will pay, within terms, Product costs and Program fees pursuant to payment terms in Exhibit "1" ("Pricing/Payment Terms"). "Primary Vendor" means Customer purchases from Distributor no less than 95% of all prescription pharmaceutical Products it purchases, as verified quarterly, and meets minimum periodic purchase levels in Paragraph 3(A) of the Pricing/Payment Terms. Orders for Products will be electronically transmitted (other than Schedule II controlled substances) and will describe Products that Distributor will provide to Customer, the quantity and designated delivery location. ~~All payment plans (except pre-pay) must be by electronic funds transfer (EFT).~~

9/5/02 RC, [initials]

2. PRO GENERICS PROGRAM PARTICIPATION

Customer will participate in Distributor's preferred generic formulary program. "Preferred Rx Options (PRO Generics)" (successor to SourceSelect and GPP®), pursuant to requirements as amended from time to time by Distributor. Customer will order all generic pharmaceutical Products from Distributor and will participate in the PRO Generics automatic substitution (ACAP or its successor). Customer authorizes Distributor as its sole agent to develop and implement a generic pharmaceutical Product list for the Term, including Product selection, the way substitutions are made and all agreements with generic suppliers. Customer will purchase from Distributor each calendar quarter no less than the minimum Net Purchase volume of generic pharmaceutical Products in Paragraph 3(A) of the Pricing/Payment Terms.

3. CUSTOMER LOCATIONS & DELIVERIES

Distributor will deliver Products to each Facility five days a week (Monday - Friday), once a day except holidays. Customer's current Facilities are located: as shown on Schedule A, attached hereto. Facility means each of Customer's retail pharmacies, together with any other facilities Customer acquires, is affiliated with or operates during the Term in the United States. Newly acquired facilities with existing agreements with other distributors will become Facilities under this Agreement upon the earlier of expiration of such existing agreement or the date Customer may terminate such agreement, with or without cause, without breaching it or paying a material termination penalty; provided, however, service to Facilities outside Distributor's normal service area may be subject to a delivery surcharge.

EXHIBIT A

4. RETURNED GOODS POLICY

Customer will only return goods to Distributor in accordance with Distributor's standard policy for returned goods ("Returned Goods Policy"), as amended from time to time by Distributor.

5. ADDITIONAL SERVICES & PROVISIONS.

Services are listed in <u>Exhibit "2"</u>. Terms, conditions and other provisions are set forth in <u>Exhibit "3"</u> ("Provisions"). Distributor may, from time to time, develop policies and procedures relative to new or existing services offered to customers, on an interim or as-needed basis. If Distributor develops such policies or procedures or changes current ones, Distributor will provide Customer with written notice at least thirty (30) days before such changes are effective.

6. TERM OF AGREEMENT

Subject to Paragraph 5 of the Provisions, the Term will be from the Effective Date until September 1, 2004. The Term will, thereafter, be extended on a month-to-month basis until either party gives at least ninety (90) days' prior written notice to the other of its intention to not extend this Agreement.

7. NOTICES

Subject to Paragraph 9.3 of the Provisions, notices to Customer will be sent to:

President
Bedard Pharmacy, Inc.,
61 College Street
Lewiston, ME 04240

President
Bedard Long Term Care
5 Herton Street
Lewiston, ME 04240

President
Bedard Medical, Inc.
1125 Lisbon Street
Lewiston, ME 04240

8. EXHIBITS

The following exhibits to this Agreement are incorporated by this reference.

    1    Pricing/Payment Terms
    2    Value-Added Services
    3    Provisions

EXHIBIT 1 TO
PRIME VENDOR AGREEMENT
PRICING / PAYMENT TERMS

In addition to payment for Products, Customer will pay Distributor the following Program and other fees for Distributor's Product distribution and Services for Customer and its Facilities. Except as otherwise provided, payments are due within 10 days from Distributor's invoice date. Pricing does not reflect any administrative or other fees to a group purchasing organization or buying group ("GPO"). If Customer contracts with a GPO, Customer will pay any such fees to the applicable GPO.

1.   PROGRAM FEES

   A.   Distribution Fee (Price of Goods). Customer will pay the following Price of Goods, which includes Distributor's fees for distribution. For Products other than SuperNet Products, Customer's Price of Goods will be based upon Distributor's "Cost" (as defined below). Distributor will add to the billed amount any applicable sales, use, business and occupation or similar tax.

| Price of Goods* | |
|---|---|
| All locations | Cost minus 1.50% |
| PRO Generics, HBC Source, drop shipments, supplies (bottles & vials), home healthcare (DME), private label, food, nutritionals, gift items, school and office supplies, fragrance, cosmetics, slow-moving items, bulk/case goods, etc. | SuperNet** |

* "Cost" means (i) the price on a manufacturer/supplier's current price list on the date Product is shipped to Customer. "Cost" is subject to Distributor's receiving from all suppliers a two percent (2%) or greater cash discount and 30 days or better terms; Cost will be adjusted accordingly if discounts and terms are less favorable. No other adjustments to Cost are made for cash discounts or purchase or performance rebates.

** "SuperNet" applies to Products sold at a special net cost quoted to Customer by Distributor. SuperNet Products are not subject to Cost-plus prices or to additional discounts. SuperNet Products include products deemed operationally difficult to manage (e.g., bulky and high-cube products). SuperNet purchases qualify towards total monthly purchase volume.

Products sold subject to a Customer/GPO contract price authorized by a supplier and maintained in a Distributor bid file are sold at the Customer/GPO contract price.

   B.   Additional Value-Added Services. The additional value-added services in Exhibit "2" will be provided to Customer by Distributor for $25.00 per month per Facility.

   C.   Ordering Hardware/Software. In addition to the foregoing value-added Services fee, Customer will pay the per-month fees in Exhibit "2" for ordering and reporting software and hardware selected by Customer for each installation on system hardware at Customer's Facilities and other locations.

D. **PRO Generics Rebates.** Distributor will issue a rebate to Customer for Net Purchases of all Rx purchases during the preceding calendar quarter if Customer's PRO Generics purchases are 8% or more of Customer's total Rx Net Purchase volume, as follows.

| COMPLIANCE LEVEL | PRO GENERICS PURCHASE REBATE |
|---|---|
| 10.01% & Over | 0.50% |
| 8.00% - 10.00% | 0.25% |

Pending rebates will be noted in Customer's invoices and statements. Customer hereby indemnifies Distributor pursuant to Provisions Paragraph 6 for any inappropriate use of such invoices. Distributor will issue any credit to Customer within forty-five (45) days of the end of each calendar quarter. If Net Purchases of PRO Generics are less than 8.00% of total Rx Net Purchases, no rebate credit will be given. Customer must be compliant with payment terms to be eligible for any rebate under this paragraph.

E. **Contract Administration.** In administering Customer's GPO/supplier contracts, Customer must (i) provide a copy of new contracts, (ii) comply with supplier's terms, (iii) use all products for its "own use" (as defined in judicial and legislative interpretations), (iv) notify Distributor at least 45 days before it changes suppliers, and (v) upon changing suppliers, assist Distributor in disposing of any excess inventory acquired for Customer. When invoiced, Customer will promptly reimburse Distributor for any unpaid chargebacks that are (x) denied by a GPO or manufacturer/supplier, or (y) not paid within 45 days; and, in either case, Customer will look solely to such GPO or manufacturer/supplier for redress.

2. **PAYMENT TERMS**

Customer agrees to the following payment terms for Product purchases.

Bedard Pharmacy, Inc.: Semi-Monthly Terms: Purchases from the 1st through the 15th of the month are due by the 25th of the same month. Purchases from the 16th through the end of the month are due by the 10th of the following month.

Bedard Long Term Care: Weekly Payment Terms Extended 4 weeks: Monday through Friday invoices are due on the fourth Friday after the week of purchase. For example, invoices dated from September 16, 2002 – September 20, 2002 would be due and payable by one o'clock pm on October 18, 2002.

Bedard Medical, Inc.: Monthly Terms: Purchases from the 1st through the end of the month are due by the 10th of the following month.

All payments must be received for deposit to Distributor's account by the due date. Distributor may change available payment plans from time to time. Payment term changes may affect Price of Goods. If Customer does not select an option or the option selected is not available, Distributor will bill Customer on Semi-Monthly terms until otherwise notified by Customer. Subject to credit approval, Customer may change payment terms upon thirty (30) days' written notice prior to the beginning of a calendar month. Price of Goods adjustments for payment terms changes are subject to changes from time to time by Distributor to reflect Distributor's cost of money and any resulting credit risk.

3. **MINIMUM ORDER VOLUME**

A. Customer's minimum annual Net Purchase (total purchases less returns, credits, rebates, late payment fees and similar items) volume during Year 1 is $6,600,000.00. Year 1 is from the Effective Date to the first anniversary of the Effective Date. Subsequent contract Years are the following 12-month periods. Customer's Net Purchases during subsequent Years are projected to increase at a rate of 5.00% per Year during each Year of the Term. Additionally, total PRO Generics Net Purchases from all Facilities will be at least 6.00% of total Rx purchases from all Facilities.

B. Customer acknowledges that Price of Goods and Service pricing available under this Agreement are based upon Customer's meeting such minimum annual, aggregate and PRO Generics Net Purchases and, if Customer fails to do so, in addition to any other remedies, Distributor may reasonably adjust Price of Goods and Service pricing to reflect the lower than expected volume of purchases.

EXHIBIT 2 TO
PRIME VENDOR AGREEMENT
ADDITIONAL VALUE-ADDED SERVICES

The following Services are offered to Customer by Distributor for the monthly fees in Paragraph 1(B) of Exhibit "1" (Pricing/Payment Terms).

- Bar-Coded Shelf Labels
- DEA Scheduled Pharmaceuticals Purchased Report
- Monthly Usage and 80/20 Report
- Price stickers – Rx and OTC

Distributor reserves the right to discontinue any Services as it deems appropriate, in which case Distributor will make a reasonable proportionate reduction in the monthly fee based upon the value of the discontinued Services. In addition, from time to time Distributor may offer such new Services, at such additional fees as it determines.

Ordering & Reporting Software and Hardware

- InterLinx reporting software for $0.00 per month per installation. (Note: InterLinx is subject to a separate software license agreement.)
- Internet ordering software (iBergen Catalog and Order Entry (COE), *iECHO* or similar software, as appropriate) for $0.00 per month per installation.
- AccuSource for $0.00 per month per installation (plus $0.00 per month for monthly CD-ROM updates).
- UltraPhase/Telxon handheld electronic order entry terminal (two per pharmacy) for no additional charge per month per installation.
- If hardware is supplied, any such hardware may be used solely with Distributor's ordering and reporting software.

Distributor retains title to all ordering and reporting hardware and software and, pursuant to Provisions Paragraph 5.2, Customer must return them upon termination of this Agreement.

Computer consulting and related services will be offered at Distributor's then-current standard charges for such services.

Recalls

Distributor will notify Customer of all recalls as instructed in the supplier's notification.

Drop Ship Service

Distributor provides drop ship service when Customer's needs dictate this approach and the supplier meets Distributor's liability insurance and other requirements. Drop shipments may be subject to an additional charge.

IN WITNESS WHEREOF, the parties have had a duly authorized officer, partner or principal execute this Prime Vendor Agreement as of the Effective Date.

CUSTOMER:
Bedard Pharmacy, Inc.
By: _____
Name: Michael R. Naderu
Title: President

DISTRIBUTOR:
AmerisourceBergen
By: _____
Name: Russell C. Crane
Title: Director of Retail Sales

CUSTOMER:
~~Bedard Pharmacy, Inc.~~
Bedard Medical, Inc.
By: _____
Name: Michael R. Naderu
Title: President

CUSTOMER
Bedard Long Term Care
By: _____
Name: ~~President~~ Michael R Naderu
Title: President

SM/CON54560/34774v.1

EXHIBIT 3 TO
PRIME VENDOR AGREEMENT
PROVISIONS

1. DUTIES OF DISTRIBUTOR

1.1 Orders. Orders may be subject to minimum order size requirements. Other than back-ordered Products, Distributor will make reasonable efforts to (i) deliver orders placed by Distributor's normal order cut-off time by the next delivery day; and (ii) ship out-of-stock Products promptly after their receipt from the supplier.

1.2 Emergency Orders. Distributor will use commercially reasonable efforts to meet a requested delivery time for emergency orders, which may be subject to an additional charge. If Distributor cannot do so, Customer may fill emergency orders outside the Program on such occasions using another provider notwithstanding minimum purchase commitments in this Agreement.

1.3 Records; Audits. Distributor will maintain records of transactions during the Term and for one year after. Customer's employees may audit such records only pursuant to Distributor's audit policies, as modified from time to time. Such audits may be conducted no more than once in any 12-month period, only during reasonable business hours and upon reasonable notice and may only cover 12 months prior to the request. All costs will be borne by Customer, including costs to produce records. If an audit shows net overcharges or undercharges and Distributor agrees with such findings, Distributor will credit or charge Customer within 30 days of written notice of the net overcharge (or, if later, within 30 days of receiving an applicable supplier's credit) or undercharge.

2. DUTIES OF CUSTOMER

2.1 Primary Vendor Orders. For Products required by Facilities, Customer will submit an electronic order for all required Products for Facilities. If allowed, non-electronic orders may by subject to additional charges.

2.2 Disclosure. Customer will comply with all laws, including reporting or reflecting discounts, rebates and other price reductions pursuant to 42 USC Sec. 1320a-7b(b)(3)(A) on cost reports or claims submitted to federal or state healthcare programs, retaining invoices and related pricing documentation and making them available on request to healthcare program representatives.

2.3 Notice of Changes. Customer will promptly notify Distributor of changes in ownership, name or business form (e.g., sole proprietorship, partnership or corporation), or any intent to sell, close, move or modify its operations.

2.4 No Set-Off. Customer's obligation to pay for Products will be absolute, unconditional and not subject to reduction, set-off, counterclaim or delay.

2.5 Billing Statements. Billing disputes must be brought to the attention of Distributor's accounts receivable department within 12 months after receipt of the first statement containing the amount in dispute or, otherwise, Customer will be deemed to accept the accuracy of such statements and to waive its right to dispute the amount.

2.6 Late Payment. All payments must be received in Distributor's account during normal business hours on the date due. Drivers and other Distributor employees cannot accept cash. Price of Goods reflects a prompt payment discount. If payment is not received by the due date, Distributor will invoice Customer such unearned discount at Cost + 2% (or, if greater, 2% more than the invoiced Price of Goods) effective as of the due date. Thereafter, if payment is delinquent, Distributor may withhold any payments to Customer and will assess a per-day late payment fee of the lower of 0.05% (18%/360) or the maximum rate permitted by law on the outstanding balance until paid, beginning on the first (1st) business day after such due date. Such rights are in addition to Distributor's other remedies and will not relieve Customer of its obligation to make prompt payment in accordance with this Agreement.

2.7 Title And Risk Of Loss. All goods are F.O.B. Customer's location, with freight prepaid. Title and risk of loss passes upon delivery to Customer.

2.8 Extension Of Credit. Payment terms are an extension of credit based upon an evaluation of Customer's financial condition upon commencement of this Agreement as reflected in written information from Customer. Customer will abide by Distributor's standard credit terms as amended from time to time by Distributor. Customer will promptly notify Distributor in writing of any Claim that, with an unfavorable result, would have a material adverse effect on Customer's financial condition or operation. Upon request, Customer will furnish Distributor complete annual and quarterly financial statements and other evidence of its financial condition necessary to establish, in Distributor's opinion, Customer's ability to perform its obligations. If Distributor reasonably believes Customer's ability to make payments is impaired or its financial condition has materially deteriorated, Distributor may from time to time amend Customer's payment terms and require posting of adequate security or such other documents as Distributor may require. Pending their receipt, Distributor may withhold delivery of goods and providing services; place Customer on a C.O.D. basis if Distributor has not received payment when due after giving notice by 10:00 a.m. and giving Customer until 2:00 p.m. the same day for Distributor to receive payment; and/or require Customer to pay part or all of any past due amount as a condition to continued service.

3. NO WARRANTIES

Customer acknowledges that Distributor is not the manufacturer of any Products and Distributor DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THOSE OF MERCHANTABILITY, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE, FOR PRODUCTS AND SERVICES. No oral or written information provided by Distributor, its employees or other representatives will create any such warranty. In no event will Distributor be liable for any special, incidental or consequential damages in connection with Products, hardware, Software, including ordering software, or services.

4. CONFIDENTIALITY

Each party and its employees or representatives ("Receiving Party") will protect all proprietary and confidential information ("Confidential Information") disclosed by the other ("Disclosing Party") and not use it except in connection with the Program or as otherwise agreed. Confidential Information does not include information (i) available on a non-confidential basis, (ii) known or able to be formulated by Receiving Party, or (iii) required to be disclosed by law. Pricing and payment terms are confidential and Customer will remove Exhibit "1" (or request confidential treatment) if it discloses this Agreement for any reason, including in a Securities and Exchange Commission filing.

5. TERMINATION OF AGREEMENT

5.1 Default. In addition to other available remedies, either party may immediately terminate this Agreement for cause upon written notice to the other party upon the other party's:

(a) (i) filing an application for or consenting to appointment of a trustee, receiver or custodian of its assets; (ii) having an order for relief entered in Bankruptcy Code proceedings; (iii) making a general assignment for the benefit of creditors; (iv) having a trustee, receiver, or custodian of its assets appointed unless proceedings and the person appointed are dismissed within 30 days; (v) insolvency within the meaning of Uniform Commercial Code Section 1-201 or failing generally to pay its debts as they become due within the meaning of Bankruptcy Code Section 303(h)(1), as amended; or, (vi) certification in writing of its inability

to pay its debts as they become due, which certification either party may require periodically (collectively "Bankruptcy");

(b) Failure to pay any amount due and such failure continues five days after written notice; or

(c) Failure to perform any other material obligation and such failure continues for 30 days after it receives notice of such breach from the non-breaching party; provided, however, if the other party has commenced to cure such breach within such 30 days, but such cure is not completed within such 30 days, it will have a reasonable time to complete its cure if it diligently pursues the cure until completion; and further provided that if such breach occurs more than three times during any 12-month period, the non-breaching party may terminate this Agreement upon 30 days' written notice.

5.2  Survival Upon Termination. Within five days of expiration or earlier termination of this Agreement for any reason, Customer will (i) pay Distributor any amount owed and (ii) return to Distributor all hardware, Software and other equipment, including ordering devices and totes, or pay to Distributor the replacement cost of such items that are not returned. Obligations in Provisions Paragraphs 4, 5.2, 6 and 9 and any provision the context of which shows the parties intended it to survive will remain in effect after the Term.

6. INDEMNIFICATION

Each party ("Indemnifying Party") will indemnify and defend the other, its employees and representatives ("Indemnified Party") against all claims and damages (including expenses and attorneys' fees) ("Claim") to the extent arising out of performance of Indemnifying Party's obligations under this Agreement. Failure to give prompt written notice of a Claim will not relieve Indemnifying Party of liability except to the extent caused by such failure. Indemnifying Party will defend a Claim with counsel reasonably satisfactory to Indemnified Party and Indemnified Party will cooperate fully in such defense.

7. CUSTOMER'S INSURANCE

Customer will maintain sufficient insurance to cover all unpaid inventory in its possession. Customer will maintain professional liability insurance with limits of no less than $2,000,000 per incident and $10,000,000 aggregate. Distributor will be named on such policies as an additional insured. Distributor may reasonably increase such required limits from time to time.

8. SOFTWARE LICENSE

8.1  License. Distributor grants Customer a non-exclusive, nontransferable and revocable license to use software and related documentation Distributor provides for use in the Program ("Software"). Customer may not make, or allow others to make, copies except one backup copy. Customer must include all proprietary notices in permitted copies. Customer may not modify Software or create derivative works and may not translate, reverse engineer, disassemble or decompile Software.

8.2  Limited Warranty. Distributor warrants that, for ninety (90) days from the Effective Date (i) Software will perform substantially in accordance with its documentation if operated as directed and (ii) hardware provided by Distributor and diskettes, CD-ROMs or other media on which the Software is provided will be free from defects under normal use. DISTRIBUTOR DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THOSE OF MERCHANTABILITY, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE, FOR HARDWARE AND SOFTWARE. No oral or written information provided by Distributor, its employees or other representatives will create any warranty.

8.3  Remedy. Distributor's liability and Customer's exclusive remedy for breach of warranties in Paragraph 8.2 will be, at Distributor's option, to (i) repair or replace Software or hardware so it performs substantially in accordance with its documentation; (ii) advise Customer how to achieve substantially the same functionality using different procedures, or (iii) replace defective media returned within 90 days of the Effective Date. Such replacement will not extend such 90-day period.

9. MISCELLANEOUS

9.1  Force Majeure. If Distributor's performance is prevented or delayed by labor disputes, fire, terrorism, acts of God, or any other cause beyond its control, including unavailability of Products, transportation, materials or fuel, delays by suppliers, loss of facilities, voluntary foregoing a right in order to comply with or accommodate government orders or requests, compliance with any law, or any other cause beyond its control ("Force Majeure"), Distributor may reduce or eliminate Products without liability or obligation during the Force Majeure period. In addition, if Force Majeure affects Distributor's cost of operations, Distributor may, at its discretion, add to the cost of Products its increased fuel costs, including taxes, and other costs associated with Product delivery, so long as Force Majeure affects its costs.

9.2  Security Interest. Customer hereby grants to Distributor a security interest which may be a purchase money security interest in Products that Customer has not paid for and in Customer's or any third party's proceeds from Products until all amounts are paid. Distributor may do such things as are necessary to achieve the purposes of this Paragraph.

9.3  Notices. Notices must be in writing and sent certified mail, prepaid, return receipt requested, or sent by facsimile as follows. Parties may change this information by written notice.

Customer:
  To the address in Agreement Section 7.
Distributor:
  AmerisourceBergen
  1300 Morris Drive, Suite 100
  Chesterbrook, Pennsylvania 19087-5594
  Attn: Vice President, Strategic Accounts
  Fax: (610) 727-3601
with a copy to:
  AmerisourceBergen Corporation
  1300 Morris Drive, Suite 100
  Chesterbrook, Pennsylvania 19087-5594
  Attn: General Counsel
  Fax: (610) 727-3612

9.4  Assignment. Customer may only assign its rights or delegate its duties under this Agreement upon written consent of Distributor. Customer hereby consents to Distributor's assigning part or all of its obligations to any affiliate and to assigning or granting a security interest in this Agreement in connection with any financing or securitization by Distributor or any affiliate.

9.5  Miscellaneous. The successful party in any legal action, including in a Bankruptcy proceeding, may recover all costs, including reasonable attorneys' fees. Internal Pennsylvania law will govern this Agreement. Any waiver or delay in enforcing this Agreement will not deprive a party of the right to act at another time or due to another breach. All provisions are severable. This Agreement supersedes prior oral or written representations by the parties that relate to its subject matter. Captions are intended for convenience of reference only. The parties may not modify this Agreement other than by a subsequent writing signed by each party. This Agreement will be interpreted as if written jointly by the parties. The parties are independent contractors. Time is of the essence in the performance of all obligations.

## Bedard Pharmacy Addendum to vendor agreement signed on September 4, 2002

We committed to paying the GPO fees for Bedard Pharmacy. PGNE (Pharmacy Group of New England) is the designated group at a fee of 0.125% of total volume.

Family Pharmacy program fee of $139 a month is the only fees charged

ProGeneric compliance Rebates are processed monthly.